J-A27035-10

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TERRY DAVID KLINE, JR., | |
| Appellant | No. 148 MDA 2009 |

Appeal from the Judgment of Sentence Entered December 19, 2008
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0005241-2007

BEFORE:  BENDER, J., GANTMAN, J., and FREEDBERG, J.[*]

MEMORANDUM BY BENDER, P.J.:                **FILED AUGUST 08, 2014**

Terry David Kline, Jr., appeals from the judgment of sentence of twenty to forty years' imprisonment, imposed after he was convicted of conspiracy to commit third degree murder, aggravated assault, and conspiracy to commit aggravated assault.  We affirm.

The facts of this case, as summarized from the trial court's opinion, are that on the night of September 6, 2007, five men including Appellant, his brother, Kenneth Kline (hereinafter referred to as "Kenneth"), Timothy Gearhart, Derik Houser, and Andrew Weber, planned to go to Shorty's Bar in Kutztown to celebrate Appellant's twenty-fourth birthday.  Houser drove the

_____

[*] Judge Freedberg did not participate in the consideration or decision of this case.

five men in his vehicle and the group arrived at the bar between midnight and 12:30 a.m. on the morning of September 7, 2007. After the bar closed at approximately 2:00 a.m., the five men congregated outside near Houser's car. A witness, who was also standing outside of the bar, claimed that Appellant, Kenneth, and Gearhart were "hyped up" and "excited," and that Appellant wanted to fight someone just for the sake of fighting. N.T. Trial, 11/3-7/08, at 167. The witness also stated that Appellant was out of control and argued with another individual in the vicinity of the group. Houser interceded, however, and at his urging, Appellant, Kenneth, Gearhart, and Weber got into Houser's car to go home.

Once underway, however, Appellant began accusing Houser of "disrespect[ing] him," and challenging him to a fight. *Id.* at 326. Appellant then jumped out of Houser's car, took off his shirt, and urged Houser to get out of the car to fight him. Houser was able to calm Appellant down and convince him to get back into the vehicle.

As the group resumed their journey home, they came upon three individuals standing on the sidewalk speaking to one another. Gearhart suggested that if they wanted to start a fight, they should provoke one of these three people. Appellant, Kenneth, and Gearhart told Houser to stop, at which point the three men got out of Houser's car, said "[l]et's fuck somebody up," and approached the three individuals. *Id.* at 331. Houser and Weber drove around the corner and parked near the intersection of Main

and Noble Streets. Meanwhile, Appellant, Kenneth, and Gearhart began to aggressively accuse the three individuals of making derogatory statements to them. One of the individuals claimed that the men were yelling and getting close enough to make her feel threatened. When a police car drove down a nearby alley and someone yelled, "cops," *id.* at 218, Appellant, Kenneth, and Gearhart left the scene and walked toward Houser's car parked on Main Street.

When the three men reached Main Street, they encountered another bystander, Kyle Quinn. Quinn, who was walking to his dormitory, was talking on his cell phone when he was confronted by Kenneth. Kenneth asked Quinn to whom he was speaking, and when Quinn responded that he was not speaking to Kenneth, Kenneth grabbed Kyle's cell phone and threw it into the street. Appellant, Gearhart, and Kenneth surrounded Quinn and began yelling at him. Eventually, Appellant threw a punch at Quinn. In the midst of the fight, Gearhart picked up a table leg, which he found in the vicinity, and swung it with great force, striking Quinn on the left side of his face. Quinn fell to the sidewalk, bleeding profusely. The blow to Quinn's head tore the artery at the base of his brain, which caused massive bleeding resulting in his death.

After Quinn fell to the ground, Kenneth and Gearhart got into Houser's car, but Appellant continued to stand over Quinn's body, saying, "I don't hear you talking anymore, bitch," and calling Quinn other derogatory names.

- 3 -

When Appellant finally returned to the car, he and his two cohorts encouraged Houser to drive away. However, before they could flee, Police Officer Corporal Paul Clery of the Kutztown Borough Police Department pulled alongside Houser's car and blocked their escape. Within minutes, additional police officers arrived at the scene and each of the five men were taken into custody.

Both Appellant and Kenneth subsequently gave statements to police on September 7, 2007, and again on September 10, 2007. While the men initially denied any involvement in the attack on Quinn, Appellant eventually admitted that Kenneth approached Quinn and exchanged words, after which Kenneth took Quinn's phone and threw it across the street. Appellant also confessed that he began arguing with Quinn, and that he saw Gearhart pick up an object and hit Quinn with it. He stated that Quinn fell to the ground and he, Kenneth, and Gearhart got into Houser's car to flee. Appellant told police that he began arguing with Quinn in order to protect his brother, but acknowledged that Quinn did not strike at any of the three men.

Appellant, Kenneth, and Gearhart were all charged with various offenses in connection with Quinn's assault and death. Gearhart subsequently entered a guilty plea to third-degree murder and conspiracy to commit aggravated assault. He was sentenced to an aggregate term of 20 to 40 years' incarceration, followed by 20 years' probation. Appellant and Kenneth proceeded to trial as co-defendants, both charged with third-degree

- 4 -

murder, conspiracy to commit third-degree murder, aggravated assault, and conspiracy to commit aggravated assault. While the jury ultimately acquitted both Appellant and Kenneth of third-degree murder, it returned guilty verdicts on the remaining charges. Appellant was subsequently sentenced to 20 to 40 years' imprisonment for the conspiracy to commit third-degree murder conviction, as well as a concurrent term of 20 years' probation for the crime of aggravated assault. The offense of conspiracy to commit aggravated assault was deemed to merge for sentencing purposes.

Appellant filed a timely notice of appeal, as well as a timely concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Herein, he raises the following two issues for our review:

A. The evidence was insufficient as a matter of law and against the weight of the evidence to convict [] Appellant of [conspiracy to commit] third[-]degree murder, aggravated assault and conspiracy [to commit aggravated assault] where there was no evidence presented that [] Appellant had the intent to kill or … that he was implicated in any conspiracy or accomplice liability.

B. The sentence was excessive and an abuse of discretion based on the sentencing guidelines and the social history that was presented to the court. The sentence also violated the State and Federal Constitutions in that it constitutes cruel and unusual punishment.

Appellant's Brief at 6.

Our Court filed an initial memorandum decision in this case on February 10, 2011. Therein, we concluded that the offense of conspiracy to commit third degree murder was a legal nullity. *Commonwealth v. Kline*,

- 5 -

148 MDA 2009, unpublished memorandum at 6-8 (Pa. Super. filed February 10, 2011).[1] We felt compelled to reach this result based on this Court's prior decision in **Commonwealth v. Clinger**, 833 A.2d 792 (Pa. Super. 2003) (stating "third degree murder is a killing done with malice that **is neither intentional** nor committed in the course of a felony"), and our Supreme Court's interpretation of **Clinger** in **Commonwealth v. Weimer**, 977 A.2d 1103, 1105 (Pa. 2009) (stating, in a parenthetical accompanying a citation to **Clinger**, that **Clinger** stands for the proposition that "because it is impossible for one to intend to commit an unintentional act, it is impossible to commit [the] crime of conspiracy to commit third degree murder").

Because we concluded in our initial memorandum decision that there was no such offense as conspiracy to commit third degree murder, we vacated Appellant's judgment of sentence for that offense and remanded for resentencing. Consequently, we did not address the merits of Appellant's sentencing issue. We did, however, assess the merits of his challenge to the

_____

[1] We acknowledged that Appellant did not challenge his conviction for conspiracy to commit third degree murder on this basis. However, we reasoned that we were required to raise this issue *sua sponte*, as it impacted the legality of Appellant's sentence and the jurisdiction of the trial court to impose a sentence for that offense. **Id.** at 6 n.2 (citing **Commonweatlh v. Kozrad**, 499 A.2d 1096, 1097-98 (Pa. Super. 1985) ("[I]t is required of this [C]ourt to correct an illegal sentence *sua sponte*."); **Commonwealth v. Boerner**, 422 A.2d 582, 588 n.11 (Pa. Super. 1980) (finding that where it is beyond the power of the court to impose a sentence, an issue regarding the court's jurisdiction is raised)).

sufficiency and weight of the evidence to support his convictions for aggravated assault and conspiracy to commit aggravated assault. We concluded that the evidence was sufficient to support Appellant's convictions for those crimes, and that the jury's verdict was not against the weight of the evidence. *See Kline*, 148 MDA 2009, at 8-13.

On October 30, 2013, our Supreme Court issued **Commonwealth v. Fisher**, 80 A.3d 1186 (Pa. 2013), which abrogated **Clinger** and held that conspiracy to commit third degree murder is a cognizable offense. *Id.* at 1195. On March 5, 2014, our Supreme Court issued a *per curiam* order granting allowance of appeal in this case and vacating our decision pursuant to **Fisher**. The Court remanded this matter to our Court for further proceedings.

Now, upon remand, we will examine the merits of Appellant's claims that the evidence was insufficient to support his convictions for conspiracy to commit third degree murder, aggravated assault, and conspiracy to commit aggravated assault; that all three of these convictions were contrary to the weight of the evidence; and that the court abused its discretion in fashioning his sentence.

We begin by addressing Appellant's challenge to the sufficiency of the evidence to sustain his convictions.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the

crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa. Super. 2003) (citations omitted).

Here, Appellant maintains that the evidence was insufficient to prove he conspired with Kenneth and Gearhart to attack Quinn. Instead, he claims that he was merely present during the assault, which was demonstrated by the evidence that he did not physically touch Quinn. Appellant also maintains that he "had no knowledge that Gerhart [*sic*] intended to harm Quinn." Appellant's Brief at 15. Thus, he avers that the evidence was insufficient to support his convictions.

Appellant's argument is unconvincing. Criminal conspiracy is defined by our Crimes Code as follows:

**(a) Definition of conspiracy.--**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a). Our Court has also summarized the elements of criminal conspiracy as follows:

> To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy. This overt act need not be committed by the defendant; it need only be committed by a co-conspirator.

*Commonwealth v. McCall*, 911 A.2d 992, 996 (Pa. Super. 2006) (citations and quotation marks omitted).

In regard to Appellant's specific conviction for conspiracy to commit aggravated assault, this Court has stated that to sustain such a conviction, "the Commonwealth need only establish intent to commit or aid in the commission of aggravated assault, an agreement with a co-conspirator, and an overt act in furtherance of the conspiracy." *Commonwealth v. Thomas*, 65 A.3d 939, 945 (Pa. Super. 2013). Moreover, for the offense of conspiracy to commit third degree murder, our Supreme Court has clarified:

> If a defendant acts with his co-conspirators in brutally attacking the victim with the intention of killing him, he conspires to commit first degree murder; if the defendant performs the same action but does not care whether the victim dies or not, he conspires to commit third degree murder. In the latter example,

- 9 -

the defendant did not … intend to aid an unintentional murder; rather, he intended to aid a malicious act resulting in a killing. Malice is not the absence of *any* intent, just the specific intent to kill. Where … the defendant intends the underlying act (the beating) which results in death, the evidence supports the charge of conspiracy to commit third degree murder.

*Fisher*, 80 A.3d at 1195 (emphasis in original).

In this case, it is clear from the factual summary, stated *supra*, that the evidence was sufficient to enable the jury to find, beyond a reasonable doubt, that Appellant conspired with Gearhart and Kenneth to commit the aggravated assault and third degree murder of Quinn. Namely, witnesses testified that after Appellant left the bar, he was looking for a fight and tried to engage several people in altercations, including his companion, Houser. When Appellant and his cohorts came upon Quinn, they encircled him and Appellant threw the first punch. Appellant admitted that during the course of the fight, he saw Gearhart pick up an object and hit Quinn hard from behind. After Quinn fell to the sidewalk, Appellant stood over his body taunting Quinn with insults. Appellant then got back into Houser's vehicle and directed him to leave the scene, admittedly in an attempt to run from the police.

This evidence proved that Kenneth, Gearhart, and Appellant conspired to viciously attack Quinn, with the intent of causing him serious bodily injury, and without regard for whether Quinn lived or died. Therefore, the evidence was sufficient to convict Appellant of the crimes of conspiracy to commit aggravated assault and conspiracy to commit third degree murder.

Consequently, Appellant is also criminally liable for the aggravated assault committed by Gearhart. *See Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) ("Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.") (citations omitted).

Appellant next contends that his convictions are contrary to the weight of the evidence, and simply reiterates the arguments proffered in support of his challenge to the sufficiency of the evidence.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-1136 (Pa. 2011) (citations and internal quotation marks omitted).

Here, in denying Appellant's challenge to the weight of the evidence, the trial court stated:

> For the reasons set forth in the previous section [addressing Appellant's challenge to the sufficiency of the evidence], it is clear that the verdict is in no way contrary to the evidence.

- 11 -

Clearly, the verdict of the jury in this case could not shock anyone's sense of justice. It certainly does not shock the [c]ourt's.

Trial Court Opinion (TCO), 6/30/09, at 18. Based on our discussion of the evidence proffered by the Commonwealth in support of Appellant's convictions, we ascertain no abuse of discretion in the trial court's determination. Accordingly, Appellant's weight of the evidence claim is meritless.

Finally, Appellant alleges that the trial court abused its discretion in imposing a sentence of 20 to 40 years' incarceration. The Honorable Paul M. Yatron of the Court of Common Pleas of Berks County thoroughly addressed Appellant's sentencing issue in his Pa.R.A.P. 1925(a) opinion, explaining the factors he considered in fashioning Appellant's sentence, and citing to the portion of the record where he expressed his rationale for the sentence imposed. *See* TCO at 18-21 (citing N.T. Sentencing Hearing, 12/19/08, at 74-80). After thoroughly reviewing the briefs of the parties, the applicable case law, and the sentencing transcript, we are satisfied that Judge Yatron's opinion adequately disposes of Appellant's sentencing claim. Accordingly, we adopt that portion of Judge Yatron's opinion as our own and conclude, on the grounds set forth therein, that Appellant's sentence was not an abuse of the court's discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/8/2014</u>

COMMONWEALTH OF PENNSYLVANIA      : IN THE COURT OF COMMON PLEAS
                                  : OF BERKS COUNTY, PENNSYLVANIA
            V.                    : CRIMINAL DIVISION
                                  : NO. CP-06-CR-0005241-2007
TERRY DAVID KLINE, JR.            :
              APPELLANT           : PAUL M. YATRON, JUDGE

Jonathan H. Kurland, Esq.
        Attorney for the Commonwealth
John J. McMahon, Jr., Esq.
        Attorney for the Appellant on appeal
        Attorney for the Appellant at trial

**1925(a) Opinion**                                            **June 29, 2009**

On November 10, 2008, at the conclusion of a five (5) day jury trial, Defendant was convicted of Aggravated Assault, Conspiracy to Commit Aggravated Assault, and Conspiracy to Commit Murder of the Third Degree in connection with the beating death of Kyle Quinn in the Borough of Kutztown, Berks County, in the early morning hours of September 7, 2007. A sentencing hearing was held on December 19, 2008, at which time Defendant was sentenced to a term of imprisonment of not less than twenty (20) nor more than forty (40) years on the charge of Conspiracy to Commit Murder in the Third Degree, and a concurrent term of twenty (20) years probation on the charge of Aggravated Assault.

The Defendant then filed a Post-Sentence Motion on December 26, 2008, which this Court subsequently denied. Defendant then filed a timely notice of appeal. Pursuant to our order, the Defendant filed a Concise Statement of Matters Complained of on Appeal in accordance with Pa.R.A.P. 1925(b), which reads as follows:[1]

1. The Evidence [sic] was against the weight of the evidence and was insufficient as a matter of law to convict the Defendant of Third Degree Murder, Aggravated Assault, or Conspiracy Where [sic] There [sic] was no evidence that the Defendant had the Intent To Kill [sic] or that he was implied In [sic] any conspiracy or accomplice Liability [sic].

2. The Defendant's sentence was excessive and an abuse of discretion based on the guidelines and his background that was presented to the court. The

---

[1] *See* Defendant's Concise Statement of Matters Complained of on Appeal filed on February 2, 2009.



1

sentence also violated the state and federal constitutions in that it constitutes cruel and unusual punishment.

We ordered the transcription of the notes of testimony of the proceedings. The final transcript was lodged on May 15, 2009, and thus the matter is ripe for exposition.

## Statement of the Case

The record, when viewed in the light most favorable to the Commonwealth verdict winner, and including all permissible inferences, reveals the following facts.[2]

In the fall of 2007, nineteen year old Kyle Quinn transferred to Kutztown University located in the Borough of Kutztown and County of Berks in order to attend the same college as his older brother, Dennis Quinn. During the first week of school, Kyle visited his brother, Dennis, on a daily basis. Notes from Trial, p. 77 (hereinafter "N.T."). On Thursday, September 6, 2007, Kyle arrived at Dennis' apartment at approximately 8:30 p.m. (N.T. 74). Dennis' friend, Alexander Krier, also arrived at the apartment at approximately 9:30 p.m. (N.T. 80).

At approximately 11:00 p.m., Dennis left the apartment and went to Shorty's Bar, also located in the Borough of Kutztown, and stayed there for approximately forty-five minutes to an hour. (N.T. 75-76). Shortly thereafter, Kyle left the apartment to attend a party and returned at approximately midnight. (N.T. 80-82). When Dennis returned to the apartment, Kyle was present as was Krier, and both were still present when Dennis went to bed at approximately 1:00 a.m. (N.T. 76). Kyle then left to return to his dormitory at approximately 2:15 a.m. on the morning of September 7th.

At approximately 2:20 a.m., Kyle called Krier on his cell phone as Kyle was walking back to his dormitory. The conversation lasted approximately two minutes. (N.T. 83).

Neither Krier nor Dennis noticed any injuries to Kyle prior to his leaving the apartment to return to his dormitory, nor did Kyle complain of any injuries. (N.T. 84). After the 2:20 a.m. phone call from Kyle to Krier, neither Krier nor Dennis Quinn would ever speak to Kyle or see him alive again.

---

[2] Proper foundation having been laid pursuant to Pa. Rule of Evidence 803.1(3), statements made by both Houser and Weber at around the time of the offense were admitted as substantive evidence without objection.

2

In neighboring Lehigh County, Derik Houser, Andrew Weber, and Defendant Terry Kline (hereinafter referred to as "Terry") had made plans to celebrate Terry's twenty-fourth birthday, which would occur on September 6, 2007. The plan was for the three to travel to Kutztown and celebrate with drinks at Shorty's Bar. (N.T. 389).

At some time between 11:00 p.m. and 11:30 p.m. on September 6, 2007, Houser travelled to Terry's house to pick him up prior to picking up Weber. To Houser's surprise, Terry was joined by his brother, co-defendant Kenneth Kline (hereinafter referred to as "Kenneth") and co-defendant Timothy Gearhart (hereinafter referred to as "Gearhart") who had decided to join the celebration. (N.T. 389).

Houser then proceeded to pick up Weber, and from there, travelled to Shorty's Bar in Kutztown, where the group arrived at some time between midnight and 12:30 a.m. on the morning of September 7, 2007. (N.T. 316).

Upon arriving at Shorty's, all five men entered the bar, and after a short period of time, separated into two groups. Terry, Kenneth, and Gearhart were in one area of the bar together, whereas Houser and Weber, having encountered several of Weber's friends, were in another area of the bar. (N.T. 164)

Upon leaving the bar after closing, Houser, Weber, and several of Weber's friends, including Tristan Robinson, stood near Houser's blue Saturn Vue automobile in the Shorty's parking lot and talked. (N.T. 164). After a few minutes had passed, Terry, Kenneth, and Gearhart exited Shorty's and approached the other group. (N.T. 166).

Robinson thought that Terry and Kenneth were, by their appearance, Puerto Ricans, and he noted that one of the two, who turned out to be Kenneth, had a Mohawk-style haircut. Robinson described the three co-defendants as "hyped up and just excited...." (N.T. 167). He further testified that one of the Kline brothers said "...that they came from Allentown and they were so hood." (N.T. 167).

Weber described Terry as being in a state of wanting to fight somebody just for the sake of fighting somebody. He further described Terry as out of control. Terry argued with one of the individuals in the vicinity. Houser told Terry to stop, because the man he was arguing with could probably beat him up. (N.T. 323).

3

Houser encouraged all members of the group to get back into the car so that they could go home. He did so several times, and ultimately, all five entered the Saturn Vue and proceeded to leave the parking area. (N.T. 320).

At that time, Terry, who was seated in the front seat next to Houser, took umbrage at Houser's encouraging all of them to go home, and began accusing Houser of "disrespecting him," and began screaming at him and challenging him to fight. Terry jumped out of the car, took his shirt off, and urged Houser to exit the car and engage in a fight with him. (N.T. 323-327).

Houser refused to do so and continued to encourage Terry to reenter the car so that they could go home. Finally, Terry got back into the car, and Houser made a left turn onto Noble Street. (N.T. 328).

At that time, three individuals, Brittany Kessler, Michael McCusker, and Harrison Jannotti, who were unknown to the occupants of the blue Saturn Vue, were standing on the sidewalk talking to each other. (N.T. 176). Upon seeing them, Gearhart suggested that if they wanted to have a fight, they should have a fight with these three . Terry, Kenneth, and Gearhart all told Houser to stop, then got out of the car and approached the three strangers. As the three co-defendants exited the vehicle, Weber heard them say, "let's fuck somebody up." (N.T. 331).

Houser instructed Weber to get out of the back seat of the Vue and join him in the front seat, and then proceeded to drive around the corner and made a right hand turn on Main Street, parking the car near the intersection of Main and Noble.

The Defendants attempted to provoke a fight with Kessler, McCusker, and Jannotti, by accusing them of having made derogatory statements about them as they drove by in the blue Saturn. (N.T. 181-182). All three bystanders described the aggressive behavior of the co-defendants herein.

Kessler indicated that she was talking with her friends, McCusker and Jannotti, when the blue Saturn Vue driven by Houser and containing Houser, Weber, and the three Defendants, stopped in their vicinity. Terry, Kenneth, and Gearhart exited the vehicle, at which time Terry said "...something like, 'what the fuck did you just say to me,' something along those lines." (N.T. 181). She identified Terry and Kenneth as being two of the three

4

men who approached her on the evening in question, and noted that Kenneth, in particular, looked different at trial because he no longer had a Mohawk haircut. (N.T. 180). She described the Defendants as being very aggressive, and "...yelling in our faces." When asked to specify what Kenneth was saying, she responded "I don't remember specifically. But they were all along the lines of, 'Did you want to start something. Did you want to do something? Did you want' -- you know, things like that." She indicated that Kenneth got close enough to her to make her feel threatened. (N.T. 181-184).

McCusker identified Terry and Kenneth in Court and also by photographs which were admitted into evidence as being two of the three people who confronted him and his friends in the early morning hours of September 7, 2007. He stated that Terry and Kenneth "...started screaming stuff at our faces saying, 'What are you looking at; did you want to fight?'" (N.T. 215). He further clarified that the Defendants stated "What the fuck are you looking at; did you want to fucking fight; I'll fucking punch you in the face." The Defendants continued to yell at McCusker and his companions and got very close to them, physically.

Then, a police car drove up the alley "and somebody yelled, Cops. I was -- and here two of them jumped back into the van. And another one walked down the street." (N.T. 218).

Jannotti testified that when he was speaking with Kessler and McCusker, Terry, Kenneth, and a third individual jumped out of a vehicle and approached them. "They were basically saying if we had a problem and, like, we were starting with them for something. And I mean, we really didn't." Jannotti repeatedly told the three that he had no problem with them and just wanted them to go away. (N.T. 255). The Defendants, however, did not accede to that request. "They continued to be in our faces, in our personal space and just saying 'do we have a problem' and basically, not threatening us but made us feel threatened." The confrontation ended only when a police car drove near, and one of the three said "...oh the cops are here. And then they walked away." (N.T. 259).

Neither Kessler, McCusker, or Jannotti knew Terry, Kenneth, or Gearhart. None of the three ever recalled seeing any of them prior to this incident.

5

Officer Brian Klouser, of the Kutztown Borough Police Department turned onto Noble Street while on patrol in a marked police vehicle. He observed Terry, holding a t-shirt in his hand, bouncing up and down with clenched fists. Klouser asked Terry if there was some problem and Terry responded that there was not and then walked toward Main Street and turned to the right. He would see Terry again approximately seven to eight minutes later, after receiving a broadcast requesting assistance from Corporal Paul Clery, also of the Kutztown Borough Police Department.

After Officer Klouser drove by, the co-defendants abandoned their efforts to provoke a fight with Kessler, McCusker, and Jannotti, and walked toward Main Street and turned right. (N.T. 259).

On Main Street, the co-defendants encountered Kyle Quinn. Kyle was walking across the street having a conversation on his cell phone, when he was singled out by Kenneth. Kenneth asked to whom he was speaking, and Kyle responded, "not to you." At that point, Kenneth seized Kyle's cell phone and threw it onto the street. (N.T. 767). The three co-defendants surrounded Kyle on the sidewalk, slightly behind the blue Saturn Vue, which contained Houser and Weber, who were sitting in the parked vehicle. (N.T. 731). Houser heard all three co-defendants yelling but did not hear Kyle say anything. Houser saw Terry throw a punch at Kyle and saw the three defendants encircling him. (N.T. 415). Gearhart then picked up a table leg, which he found in the vicinity, and swung it with great force, striking Kyle on the left side of his face. (N.T. 761, 781). Kyle fell to the sidewalk, bleeding profusely.

Kenneth and Gearhart quickly entered the back seat of the blue Saturn, and as Terry stood on the sidewalk above Kyle's body, Weber heard him say, "You're such a bitch. You're a pussy." (N.T. 716, 723). At trial, Weber testified that he heard Terry say to the prostrate Kyle "Something like, 'I don't hear you talking anymore, bitch.' Or 'stand up.' Or 'get up,' something like that." (N.T. 340). As all three co-defendants encouraged Houser to drive away, a police car operated by Corporal Paul Clery of the Kutztown Borough Police Department pulled along side and prevented Houser's flight. (N.T. 100-101).

6

Clery had first observed the group as he patrolled Main Street, and as he got closer to the parked Saturn Vue, he observed Kyle lying on the sidewalk and the Defendants getting into the blue Vue. (N.T. 98).

He observed Terry standing next to Kyle's body and enter the Vue. (N.T. 98). As he got closer, he became more sure that what he observed on the ground was a body, covered with blood and not moving. (N.T. 100). He used his vehicle to box the Vue in, and put on his emergency lights. He then exited his vehicle, drew his weapon, and told everyone inside the Vue to raise their hands. (N.T. 102).

After initially holding still, Terry said that he "had no right to hold them," and that they knew nothing about the guy on the sidewalk. (N.T. 105-106). Gearhart repeated those declarations to Clery. Clery described all three co-defendants as angry and yelling, and not following his instructions to keep their hands on the roof of the vehicle. Terry, defying instructions, got out of the car and started yelling, as did Kenneth. Terry declared "I'm outta here" and walked toward Corporal Clery. (N.T. 106).

Houser and Weber were cooperative and remained in the front seat of the car as instructed. (N.T. 108). Clery identified all three co-defendants and indicated that none of them had any signs of injury. Within minutes, additional officers arrived and each of the five individuals from the Saturn Vue were taken to Kutztown Borough Police Headquarters in separate vehicles.

Corporal William Easparro, was an officer with the Berks-Lehigh Regional Police Department and was on patrol in the early morning hours of September 7, 2007. (N.T. 481). He was dispatched to go to Kutztown Borough to assist the Kutztown Borough Police Department after Kyle was assaulted. (N.T. 482).

Upon arriving at the scene, Corporal Easparro spoke with Officer Klouser, who transferred Defendant Kenneth into his custody and instructed him to place Kenneth in his patrol vehicle. (N.T. 482-483).

Corporal Easparro identified himself to Kenneth and advised him that if he needed anything he just needed to tell the Corporal what that was. When Kenneth asked him why he was being held in his vehicle, Easparro responded that he did not know, other than to indicate that he was requested by Officer Klouser to do so. (N.T. 483).

7

Despite the fact that Corporal Easparro asked Kenneth no questions, Kenneth told him that he had been drinking with his brother to celebrate his birthday. He stated that the revelers were simply driving down Main Street when police stopped them. Kenneth then questioned again as to why he was being detained in Easparro's car. (N.T. 483).

Both Terry and Kenneth gave statements to Berks County Detective Douglas Weaver on September 7, 2007, and again on September 10, 2007. In his September 7th statement, Kenneth stated simply that after drinking at Shorty's he got out of the car in which he was travelling in order to urinate. (N.T. 757). He further stated that "I grabbed a cell phone from someone and threw it and walked back to the car. We got in, started driving away. And the cops showed up. When I seen the guy with the phone, I thought he was talkin' to me. I asked him. He said 'I'm not fucking talking to you.' I took the phone and threw it then got back in the car." (N.T. 553-555)

In his September 10th statement Kenneth repeated his story about taking the cell phone from Kyle and throwing it. (N.T. 767). He claimed not to have seen Kyle lying on the sidewalk until Officer Clery stopped the group from leaving the scene and he got out of the car. He claimed to not know that Gearhart had struck Kyle until he learned about it at the processing center. (N.T. 767). He further claimed that he did nothing to harm Kyle and did not want it to happen. He concluded his statement by noting that he did not learn that the person whose cell phone he had taken was the same person who he saw lying on the sidewalk at the scene until he learned that it was the same person at the processing center. (N.T. 767).

Terry's September 7th statement was considerably shorter than his brother's. He wrote "I came around the corner and want to get into the car. Cops came and I trune [sic] around and seen the man on the floor." (N.T. 759). His September 10th statement contained more detail. (N.T. 760).

He recounted Kenneth's encounter with Kyle, and he stated that Kenneth said, "What did you say?" He indicated that Kyle said something, although he did not remember what it was, and that Kenneth then seized the cell phone and threw it across the street. Terry indicated that he then turned around and started arguing with this individual who he characterized as "the gentleman." While he was arguing with him, Gearhart "...picked up an object and hit him with it and the gentlemen fell to the sidewalk. After that we got in the

8

vehicle to run." Terry claimed that he began arguing with Kyle because he "...wanted to defend my brother." He acknowledged, however, that Kyle did not strike at any of the three. (See Terry Kline's Statement, Exhibit 51, Page 760 at 761-763)

A search of the vicinity of the assault was made by Officer Klouser. (N.T. 289). The weapon used to strike Kyle was found behind 172 West Main Street, a short distance from where Kyle's body lie on the sidewalk. (N.T. 292). Additionally, Kyle's cell phone was found by Officer Klouser in three pieces on Main Street itself. Both of these objects were identified and admitted into evidence as Commonwealth Exhibits 35 and 28, respectively. (N.T. 296).

Kyle's autopsy was conducted by Dr. Saralee Funke, a forensic pathologist from the Allentown, Lehigh County area. She illustrated to the jury the injuries Kyle sustained to his forehead, face, cheek, jaw, and neck and explained that they were consistent with being struck forcefully by Commonwealth's Exhibit 35, the table leg. (N.T. 620-623). The brutality of the wound to the forehead was illustrated by the fact that it was:

> ...1 and a half inches long was quite deep, went almost to the bone in depth and would have produced a significant amount of blood loss because even at the time of the autopsy -- and I was doing this autopsy 30 and a quarter hours after Kyle had died in the emergency room.

> Even at the time of the autopsy there was a vessel at the top of that cut that was still oozing copious amounts of blood to the point where I had to use surgical clamps over each end of this cut vessel to crush them so that it would stop bleeding so we could get some photographs that would be free of blood contamination. So this vessel in the forehead area was of significant size and would have led to quite a bit of blood loss and quite a bit of rapid blood loss. (N.T. 619).

Dr. Funke concluded that Kyle's death was caused by the tearing of an artery at the base of Kyle's brain.

> So the impact of this blow jarred the inside of his head sufficiently that an artery tore and caused this massive bleeding at the base of his brain. This amount of bleeding will cause pressure on the brainstem. The brainstem controls vital functions of breathing and heart rate. When you get massive bleeding around the brainstem such as occurred in this case, death will occur. And it will occur very quickly. (N.T. 621-622).

9

Timothy Gearhart, Terry Kline, and Kenneth Kline were charged in connection with assault on Kyle Quinn. All three were initially charged with Murder in the First Degree, Conspiracy to Commit that offense, and various lesser included offenses, including Murder of the Third Degree and Aggravated Assault.

On the 6th day of August, 2008, Defendant Timothy Gearhart entered an open plea to one count of Murder in the Third Degree and one count of Conspiracy to Commit Aggravated Assault.[3] On the 25th day of August, 2008, Gearhart was sentenced to a term of imprisonment of not less than twenty years (20) nor more than forty (40) years on the Murder count, and a consecutive sentence of twenty years (20) probation on the charge of Conspiracy to Commit Aggravated Assault. It is undisputed that Gearhart wielded the table leg as a club and inflicted the fatal injuries to Kyle Quinn.

Terry and Kenneth proceeded to trial on charges of Murder in the Third Degree, Aggravated Assault, and Conspiracy to Commit both Murder in the Third Degree and Aggravated Assault. The jury found both Defendants not guilty of Murder in the Third Degree but convicted both of Conspiracy to Commit Murder in the Third Degree, First Degree Felonious Aggravated Assault, and Conspiracy to Commit Aggravated Assault. Sentence was imposed on the charge of Conspiracy to Commit Murder in the Third Degree and on the charge of Aggravated Assault. The count of Conspiracy to Commit Aggravated Assault was deemed to merge for purposes of the imposition of sentence.

A sentencing hearing was held on December 19, 2008. We heard testimony, on behalf of the Commonwealth, from the victim's fiancée, brother, sister, mother, and father.

In addition to Defendants' mother and father testifying on behalf of the Defendants, both Terry and Kenneth testified in their own behalf.

We also considered, with the consent of all counsel, letters and memoranda from the victim's family and friends, comprising ninety-nine (99) pages. A number of photographs were also submitted. Both the letters and photos were appended as Exhibits to the transcript of the sentencing proceedings.

---

[3] *See* this Court's Sentencing Order of August 25, 2009, Timothy R. Gearhart, No. CP-06-CR-0005239-2007

After taking into account the jury's verdict, the evidence in the case, the provisions of the sentencing guidelines, and the sentencing code, we imposed sentence. On the charge of Conspiracy to Commit Murder in the Third Degree, we sentenced both Defendants to not less than twenty (20) nor more than forty (40) years imprisonment, which was a sentence within the standard range of the sentencing guidelines. Additionally, we sentenced both Defendants to a term of probation of not less than twenty years (20) on the charge of Aggravated Assault. The probationary sentence was made concurrent with the sentence of imprisonment.

## DISCUSSION

Defendant's first matter complained of, pursuant to his Rule 1925(b) Statement is, on its face, gibberish. We presume, however, that Defendant challenges the weight and sufficiency of the evidence and argues that his conviction is not supported by the evidence. Further, Defendant's misstatement of the offenses of which he was convicted will be ignored, and we will address the issues as though properly raised.

Defendant's second matter is a generalized, boiler plate challenge to the discretionary aspects of the sentence imposed. While under our jurisprudence we are not required to address such a complaint, in the interest of caution and thoroughness, we will nevertheless treat the complaint as though it were proper.

### Sufficiency of the Evidence

"When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." Commonwealth v. Gruff, 822 A.2d 773, 783 (Pa. Super. 2003) citing Commonwealth v. Chambers, 528 Pa. 558, 599 A.2d 630 (Pa. 1991).

> In applying this standard, we bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence; that the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and that the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.

11

Commonwealth v. Kennedy, 959 A.2d 916, 921 (Pa. 2008).

> In examining a challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, there is sufficient evidence to enable the fact finder to find every element of the crime beyond a reasonable doubt....The established facts and circumstances do not have to be absolutely incompatible with the accused's innocence, but any doubt is for the factfinder unless the evidence is so weak and inconclusive that no probability of fact can be drawn from the totality of the circumstances as a matter of law.

Commonwealth v. Lyons, 833 A.2d 245, 258 (Pa. Super. 2003) (internal citations and quotations omitted).

## Conspiracy Standard

> To sustain a conviction for Criminal Conspiracy, the Commonwealth must prove beyond a reasonable doubt that the defendant (1) entered into an agreement to commit or aid in an a criminal act with another person or persons (2) with a shared criminal intent and that (3) an overt act was done in furtherance of the conspiracy.

Commonwealth v. Johnson, 920 A.2d 873, 878 (Pa. Super. 2007).

> Regarding the crime of conspiracy, [the Superior Court] has recently stated that:
>
> To convict of criminal conspiracy, the evidence must establish that the defendant entered an agreement with another person to commit or aid in the commission of an unlawful act, that the conspirators acted with a shared criminal intent, and that an overt act was done in furtherance of the conspiracy. 18 Pa.C.S.A. § 903. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.
>
> Once a conspiracy is established, the actions of each coconspirator may be imputed to the other conspirators. In this regard, [t]he law in Pennsylvania is settled that each conspirator is criminally responsible for the actions of his co-

12

conspirator, provided that the actions are accomplished in furtherance of the common design.

Commonwealth v. Geiger, 944 A.2d 85, 90-91 (Pa. Super. 2008) (internal citations and quotations omitted).

## Aggravated Assault Standard

An individual is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

18 PA. CONS.STAT. ANN. § 2702(A)(1).

We have defined "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 PA. CONS.STAT. ANN. § 2301. In order to sustain a conviction for aggravated assault, the Commonwealth does not have to prove that the serious bodily injury was actually inflicted but rather that the Appellant acted with the specific intent to cause such injury. Further,

[w]here the victim does not sustain serious bodily injury, the Commonwealth must prove that the appellant acted with specific intent to cause serious bodily injury. The Commonwealth may prove intent to cause serious bodily injury by circumstantial evidence. In determining whether the Commonwealth proved the Appellant had the requisite specific intent, the fact-finder is free to conclude the accused intended the natural and probable consequences of his actions to result therefrom. A determination of whether an appellant acted with intent to cause serious bodily injury must be determined on a case-by-case basis.

An intent is a subjective frame of mind, it is of necessity difficult of direct proof[.] We must look to all the evidence to establish intent, including, but not limited to, appellant's conduct as it appeared to his eyes [.] Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances. Moreover, depending on the circumstances even a single punch may be sufficient.

Lastly,

13

(m)alice is a crucial element of aggravated assault, and is established when there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Where malice is based on a reckless disregard of consequences, it must be shown that the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury; at the very least, the conduct must be such that one could reasonably anticipate death or that serious bodily injury would likely and logically result.

Commonwealth v. Holley, 945 A.2d 241, 247 (Pa. Super. 2008) (internal citations and quotations omitted).

## Third Degree Murder Standard

The Pennsylvania Criminal Code defines third degree murder as any killing with malice that is not first or second degree murder. *See* 18 Pa.C.S.A. § 2502(c). Decisional precedent further establishes that third degree murder requires no specific intent to kill. Commonwealth v. Baskerville, 681 A.2d 195, 199-200 (1996). Rather, the *mens rea* for third degree murder is malice, the definition of which is well settled:

Malice consists of a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured...." Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa. Super. 2001) (internal citations and quotations omitted).

## Analysis

Against this backdrop, it is clear that there is no merit to Terry's contention that there is insufficient evidence to sustain his conviction. First off, it must be observed that his complaint in his Concise Statement to the effect that there was no evidence that he had the intent to kill is a non sequitur. Defendant was neither charged with nor convicted of first degree murder, or conspiracy to commit that offense. Those offenses are the only crimes which require the Commonwealth to prove that he had the intent to kill his victim. Likewise,

14

his contention that he was not "implied in [sic] any conspiracy or accomplice liability [sic]" belies both the factual record and the jury's verdict.

The evidence clearly demonstrates that Terry was belligerent and spoiling for a fight almost immediately upon leaving Shorty's Bar in the early morning hours of September 7, 2007. When his attempt to provoke a fight with a stranger in the parking lot of the bar failed, he turned on his own friend and co-reveler, Houser.

Demonstrating the correctness of his friend Weber's observation to the effect that Terry wanted to engage in a fight with someone, anyone, he jumped from Houser's vehicle, berated Houser, and challenged him repeatedly to get out of the car and fight. Only Houser's refusal to do so and persistence in coaxing Terry back into the vehicle prevented violence at that juncture.

Moments later, the intentions of the three co-defendants became clear. Gearhart's suggestion that they fight Kessler, McCusker, and Jannotti was met with immediate agreement by both Terry and Kenneth. All three beckoned Houser to stop the vehicle and all three evidenced an intention to realize Terry's goal to "fuck someone up." It is both interesting and of evidentiary significance that Terry did not declare that he, alone, was going to do that. He beckoned the others to participate, and both Kenneth and Gearhart evidenced their shared intent and agreed upon conduct by directing Houser to stop the car and immediately jumping out.

The evidence further shows that the three confronted the two young men and one young woman who were peaceably standing on the sidewalk and attempted to provoke a fight. Had it not been for the serendipitous appearance of the police car containing Officer Klouser, they might have succeeded in their goal without ever encountering Kyle Quinn. That one of the three co-defendants alerted the others by yelling "cops" and their leaving the area, demonstrates both that they were in control of their faculties and that they realized the wrongfulness of their conduct.

This constitutes strong evidence from which the jury could conclude that the Defendants were acting in concert and that their goal was to cause serious injury to someone. Unfortunately, the events that occurred a few minutes after the co-defendants left Noble

15

Street and turned onto Main Street would provide conclusive evidence of their intent and cost Kyle Quinn his life.

From the testimony at trial, the jury was free to conclude that events unfolded as described by Houser and Weber. The jury could determine that while Gearhart was unsuccessful in selecting a victim or victims on Noble Street, Kenneth succeeded on Main Street. By engaging Kyle, seizing his cell phone and smashing it on the street, Kenneth began the deadly spiral of events that followed. The testimony showed that the three Defendants surrounded Kyle Quinn and that they shouted at and threatened him. The jury could conclude that Terry punched or attempted to punch Kyle and that Kyle could not escape because he was encircled by the three co-defendants. It is clear from the evidence that Terry saw Gearhart with the table leg in his hands prior to his striking Kyle. Neither Terry nor Kenneth did anything to warn Kyle, nor did they attempt to stop Gearhart from striking the blow.

Terry's rantings over the prostrate body of Kyle calling him a "bitch" and "pussy" also tend to show malice. Additionally, the use of the table leg as a weapon, which, like a baseball bat, must be considered a deadly weapon, to strike Kyle in the face and head clearly constitutes malice under our jurisprudence.

All three Defendants upon reentering the vehicle urged Houser to quickly leave the area. When their attempt to escape was thwarted by Corporal Clery, both Terry and Gearhart protested being stopped as being against their "rights."

Denials by both Terry and Kenneth of any knowledge of the injured man on the sidewalk and their attempts to flee are cognizable under our law as showing consciousness of guilt. Subsequent statements wherein both Terry and Kenneth attempted to shift all blame to Gearhart also constitute such evidence, when contrasted with other evidence demonstrating the acts actually committed by both Terry and Kenneth.

In sum, there is ample evidence supporting the jury's verdict. To characterize the evidence in the case as being insufficient as a matter of law to sustain the convictions borders on frivolity.

16

Our courts have long held that an aggravated assault is a third degree murder where, for some unexplained reason, the victim did not die.[4] Likewise, we make no distinction between that malice which is essential to a finding of third degree murder and that needed to sustain a conviction for aggravated assault. Commonwealth v. Kling, 731 A.2d 145, 147 (Pa. Super. 1999). In order for a defendant to be convicted of conspiracy, "...the crime that is the object of the conspiracy must *either* be intended to be accomplished, or *have* been accomplished. (emphasis in the original Commonwealth v. Klinger, 833 A.2d 792, 796, (Pa. Super. 2003)).

The jury, having found Terry and Kenneth guilty of Conspiracy to Commit Murder in the Third Degree, could have, and presumably should have also found them guilty of the substantive crime of Murder in the Third Degree pursuant to our instructions on liability of co-conspirators. Our jurisprudence recognizes, however, that jurors are empowered to render verdicts irrespective of the facts that are before them and the instructions of the court. See Commonwealth v. Frisbie, 889 A.2d 1271, 1273 (Pa. Super. 2005).[5] We further recognize that compromise verdicts are commonplace. Finally, even inconsistent verdicts are recognized as valid, unless an acquittal on one charge precludes the finding of a necessary element in another, such as finding a defendant guilty of Murder in the Second Degree but not guilty of the counts that supply the element of the killing having been committed in the perpetration of a felony.

For these reasons, we believe that there is ample evidence to support the jury's verdict, and respectfully request the Defendant's appeal of the verdict against him be denied.

---

[4] See Commonwealth v. Hickson, 586 A.2d 393 (Pa. Super. 1990).
[5] The Court in *Frisbie* noted that:

> [I]nconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Rather, the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is sufficient evidence to support the verdict.

Id. at 1273.

17

## Weight of the Evidence Standard

"A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict, but contends, nevertheless, that the verdict is against the weight of the evidence." Commonwealth v. Davis, 799 A.2d 860, 865 (Pa. Super. 2002). A verdict is contrary to the weight of the evidence where "the verdict is so contrary to the evidence ... [that it] shock[s] one's sense of justice." Commonwealth v. Bennett, 827 A.2d 469, 481 (Pa. Super. 2003) (citing Commonwealth v. Brown, 648 A.2d 1177, 1189 (Pa. 1994)). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. McCloskey, 835 A.2d 801, 809 (Pa. Super. 2003).

The issue of whether the verdict reached by the finder of fact is contrary to the weight of the evidence is in the sound discretion of the trial court, and will not be overturned absent abuse of discretion. Commonwealth v. McCloskey, 835 A.2d 801, 809 (Pa. Super. 2003). "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the records shows that the action is the result of partiality, prejudice, bias, or ill will." Commonwealth v. Forbes, 867 A.2d 1268, 1273 (Pa. Super. 2005) (citations omitted). Not surprisingly, "a trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is '[o]ne of the least assailable reasons for granting a new trial.'" Commonwealth v. Sullivan, 820 A.2d 795, 807 (Pa. Super. 2003) (quoting Commonwealth v. Widmer, 744 A.2d 745, 753 (Pa. 2000)).

For the reasons set forth in the previous section, it is clear that the verdict is in no way contrary to the evidence. Clearly, the verdict of the jury in this case could not shock anyone's sense of justice. It certainly does not shock the Court's.

## Excessive Sentence Standard

When reviewing whether a sentence is excessive, the standard of review is well settled that:

18

[The Superior Court] may only reach the merits of an appeal challenging the discretionary aspects of sentence where it appears that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. A substantial question will be found where the defendant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the code or is contrary to the fundamental norms which underlie the sentencing process.

If an appellant raises a substantial question as to the appropriateness of a sentence, our scope of review has been defined as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Commonwealth v. Booze, 953 A.2d 1263, 1278-79 (Pa. Super. 2008) (internal citations and quotations omitted).

Our Supreme Court has declined to create a bright-line standard to determine when a sentence is manifestly unreasonable, but noted that "the General Assembly intended the concept of unreasonableness to be inherently a circumstance-dependent concept that is flexible in understanding and lacking precise definition." Commonwealth v. Wall, 926 A.2d 957, 963 (Pa. 2007). However, the Court did note that such an analysis requires a review of the four statutory factors enumerated in 42 Pa.C.S.A, § 9781(d):

(1)     The nature and circumstances of the offense and the history and characteristics of the defendant.
(2)     The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
(3)     The finding upon which the sentence was based.
(4)     The guidelines promulgated by the commission.

Id. at 964.

The Court further explained that "a sentence may also be unreasonable if . . . the sentence was imposed without express or implicit consideration . . . of the protection of the

19

public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant." Id. (citing 42 Pa.C.S.A. § 9721(b)). "Moreover, even though the unreasonableness inquiry lacks precise boundaries, we are confident that rejection of a sentencing court's imposition of sentence on unreasonableness grounds would occur infrequently, whether the sentence is above or below the guidelines, especially when the unreasonableness inquiry is conducted using the proper standard of review." Id.

The sentencing proceeding in this matter occupies eighty-two (82) pages of transcript. Additionally, 111 pages of exhibits, consisting of photographs and letters were made part of the record. We reviewed every page of those exhibits prior to imposing sentence.

We do not believe that the second issue complained of on appeal, as articulated in Defendant's 1925(b) statement, raises a substantial question entitling Defendant to Appellate review of the discretionary aspects of his sentence. See Commonwealth v. Perry, 883 A.2d 599 (Pa. Super. 2005), see also Commonwealth v. Mouzon, 812 A.2d 617 (Pa. 2002). Nevertheless, we will address the claim as though such a question has been raised.

In addition to the exhibits previously mentioned, we also reviewed thoroughly the Pre-Sentence Investigation Report that had been prepared by the Adult Probation Office. We reviewed and considered every provision contained in the sentencing code that pertained to such cases. We took into account the nature and circumstances of the offense and the history and characteristics of the Defendant. We observed the Defendant carefully when he exercised his right of allocution prior to the imposition of sentence.

Our reasons for the sentence were set forth in detail and occupy seven (7) pages, almost ten (10) percent of the entire sentencing proceeding. Notes from Sentencing, pp. 74-80 (hereinafter "N.S."). We also took into account the provisions of the sentencing guidelines; indeed, the sentence imposed was within the standard range of those guidelines. We also considered the fact that despite the length of the sentence ultimately imposed, the Defendant would one day be paroled and live as a free man. His victim was deprived of that for eternity.

There is no point in reiterating everything that is readily seen by reviewing the sentencing transcript. Suffice it to say that the sentence imposed, being within the standard

range of the sentencing guidelines, and buttressed by all of the factors previously set forth, was neither excessive nor an abuse of discretion. It can in no way be seen as a violation of the State and Federal Constitutions nor does it constitutes cruel and unusual punishment.

For all these reasons, we respectfully request that the Defendant's appeal be denied.